## UTAH-IDAHO SUGAR CO. et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4599.   Decided January 16, 1928.   (263 P. 746.)

*Young & Boyle,* of Salt Lake City, for plaintiffs.

*Harvey H. Cluff,* Atty. Gen., and *J. Robert Robinson,* Asst. Atty. Gen., for defendants.

THURMAN, C. J.

This is a proceeding to review an award of compensation made by the defendant Utah Industrial Commission in favor of the dependents of John H. Thomas, deceased.

Mrs. Bell Thomas, the widow of deceased, on August 21, 1926, filed with the commission her application for compensation from which it appears that on November 23, 1925, her husband, John H. Thomas, was injured by reason of an accident arising out of or in the course of his employment with the Utah-Idaho Sugar Company, and that as a result of such injury he died on July 14, 1926. The sugar company was an employer within the Utah Industrial Act (Comp. Laws 1917, §§ 3061-3165), and the plaintiff Hartford Accident & Indemnity Company carried the insurance. It is admitted that the deceased on the date of the alleged injury was in the employment of the plaintiff sugar company and was being paid wages in the sum of $4 per day. Plaintiffs, however, deny that the deceased was injured in the course of such employment or that his death resulted therefrom. Hearings were had before the commission on the issues, presented at which all parties interested were represented. The commission, having heard and considered the evidence, both oral and documentary, on May 4, 1926, made and entered its findings and award in favor of the applicant.

The plaintiffs here challenge the validity of the following findings on the grounds that there is no substantial evidence to sustain them:

"(2) That on the 23d day of November, 1925, John H. Thomas was engaged by the defendant employer in laying flumes, and while thus engaged and while in a stooping position astraddle of a flume, at about 10 o'clck a. m. of said day, he was struck in the back of the neck by a hard beet or beets, which fell from the high line or track that was from 8 to 10 feet above him. That at the time of being so struck Mr. Thomas cried out to one J. E. Jones, a fellow employee, who was then on the said track above him: 'Jack, what in the hell are you doing * * * You are knocking beets down on me.' And in response to the question by Jones: 'What's the matter?' Thomas said: 'That beet hurt me.' That Mr. Thomas was obliged to sit down as a consequence of being struck by the said beet, and shortly thereafter as a further consequence his speech was affected, and he could not swallow his food at the noon hour following. That he was thereupon taken to his home by Stanley Lewis, construction foreman of the said sugar company, and Dr. Joseph Hughes was called and came to attend upon Mr. Thomas about between 12 and 1 o'clock p. m. of said day. That at the time Dr. Hughes saw him he was unable to talk and was prostrated and had evidence of having met with a severe injury. The doctor called upon Thomas the next day and then found his condition to be such that his speech had not returned and he had difficulty in swallowing and showed stiffening on the face on the right side; that these symptoms of paralysis persisted for a long while—up until the latter part of December, 1925, when they began to abate—paralysis of speech and general loss of control of himself.

'(3) That after the said injury of November 23, 1925, Mr. Thomas never regained his health, and at best was able thereafter to perform only light work of a clerical nature. That for several years prior to the said injury of November 23, 1925, Mr. Thomas was a member of the fire department of Spanish Fork, Utah, and took part in the regular drills and performed the other physical requirements incident thereto, including the climbing of fire ladders from 40 to 50 feet high, and experienced no difficulty in the performance of this work, and never exhibited any signs of being in any way physically disabled to execute his said duties, and up to the time of his said accident is shown to have been an able-bodied man and to have performed his work at the sugar factory in a satisfactory manner and to have done equal labor and kept up his end of the job along with the other men similarly employed; but that after November 23,

1925, the date that Mr. Thomas was struck in the back of the neck by the said beet or beets he was seriously disabled and never fully recovered from the said injury then and there sustained as aforesaid, and finally he died on July 14, 1926, as a result of the said accident sustained by him on November 23, 1925."

Two questions of fact are presented for determination: (1) Was the deceased, John H. Thomas, injured by means of an accident while in the course of his employment November 23, 1925? (2) If he was so injured, was such injury the cause, or a contributory cause, of his death which occurred July 14, 1926?

In order to determine these questions, it is necessary to briefly state the substance of the evidence relied on in support of the award. There is substantial evidence to the effect that on November 23, 1925, deceased and a companion, who was a witness in the case were working together for the plaintiff sugar company, laying flumes; that while engaged in said work witness had occasion to cross a crib of sugar beets situated above where deceased was sitting "astraddle of the flume," when deceased "hollered" and said, "Jack, you are knocking beets down on me." Witness told him he had better come out. He saw deceased about a half hour later sitting down and upon inquiry as to what was the matter deceased said, "That beet hurt me." A short time later witness saw deceased again, and deceased could not talk to him—"his jaws were locked." Witness called some of the boys to take deceased home. He saw deceased at his home about a month later and he was in "bad shape." The witness did not see the beet fall on deceased, but saw that deceased "was astraddle of the flume, stooping over." This witness and several others, some of whom were coemployees, testified that up to that time deceased was in good health and was always able to do his work. His widow testified to his uniform good health and said that on the day of the accident when he left home he was in as good health as usual. Some witnesses testified to his being a member of

the fire department and performing his duty there the same as other members; that such duty involved the climbing of ladders, sometimes 40 and 50 feet in height, which duty the deceased performed in common with the other members. Deceased was 48 years of age when the alleged accident occurred. It is unnecessary to detail the testimony of each of these witnesses as to the good health and physical condition of the deceased prior to November 23, 1925, when it is alleged the accident happened. After that date he was never able to resume his employment. He did some slight clerical work in connection with an electrical concern in which he was financially interested, but was unable to perform hard manual labor. He died July 14, 1926.

Dr. Joseph Hughes, a practicing physician, attended the deceased from the date of the alleged accident to the date of his death. He testified he was a graduate of Jefferson Medical College. He made an examination of deceased within an hour after deceased was taken home. It was about 12 or 1 o'clock. Deceased was unable to talk or give any definite history at that time. He was prostrated and gave evidence of having met with a severe injury. Witness had him put to bed and given rest treatment until he could get a definite history of the case. The next day there was no change; he could not speak, had difficulty in swallowing, and showed stiffening of the face on the right side. Witness called Dr. E. G. Hughes, of Provo, for consultation. They went over the case together. Deceased tried to tell them something, but his tongue was thick and his throat dry. These symptoms of paralysis continued until the latter part of December when they began to abate. Witness notified the insurer that deceased was speedily regaining his normal condition and was ready to resume his job. The company sent him a check covering the time he had been afflicted. Deceased refused to accept the check because he was not well and further treatment was ordered and given. In March he was able to do clerical work, and witness released him for that purpose. On April 3, 1926, he had a paralytic

stroke, apoplectic in character, involving hemiplegia of the right side, right arm, leg, right forehead, and face. He showed signs of getting better until May when he had a second stroke, which lasted a few hours, involving the left side. From then on he "wilted like a flower" and wasted away until he died. When witness first examined him November 23, 1925, he showed evidence of an injury at the back of his head—a swelling over the neck and between the shoulders. Witness issued a death certificate attributing the death to bulbar paralysis, giving the accident of November 23, 1925, as a contributing cause. He filed the certificate with the state board of health. Witness was still of opinion that the death of deceased was the result of that accident. There was some abrasion, but not bleeding. The ninth, tenth, eleventh, and twelfth cranial nerves were involved. The swelling extended from the base of the skull down to between the shoulders about six inches. His heart at that time was regular. It was in a normal condition, his blood pressure ran 140 systolic and 90 diastolic. The blood pressure for his age was about normal. The blood pressure was taken shortly after the injury. Witness made a record of it at that time. Witness further testified that the accident was the direct cause of the stroke, and that he never recovered. His every symptom showed it, paralysis of speech, his walking, his whole action was slow, his mentality was slow. Previous to that he was healthy and active. The very symptoms he had on the day of the accident and on April 3rd persisted until his death. There was a concussion of the spinal cord—inflammation of the spinal cord in the cervical region involving that part and extending to the brain. Inflammation of the spinal cord would show hemiplegia if you get a traumatic injury. Witness had been deceased's family physician three or four years; had never treated him before. He took X-rays following the injury. They did not show fractures. The spinal cord is protected by the vertebra. In 1926 deceased had an ordinary spell of la grippe for about 10 days. Witness had seen deceased go

through fire drills. He knew deceased so well he did not go into heart conditions, as possibly he ought to have done. Witness had examined deceased for insurance and found him fit. That was in 1921, prior to the injury.

Dr. E. G. Hughes, physician and surgeon, a gratuate of Jefferson Medical College, had occasion to consult with Dr. Joseph Hughes, in the case of John H. Thomas, on November 23 or 24, 1925; found Thomas unable to talk. Witness assumed he had bulbar paralysis affecting the ninth, tenth, eleventh, and twelfth cranial nerves. He had glasso pharyngeal paralysis. It affected the muscles that control the act of speech and swallowing. He appeared to be very weak and on the verge of prostration, but did not complain of pain. Witness at that time got the clinical history of his having been injured by beets falling on him from a height of 8 or 10 feet. He showed evidence of paralysis following this injury. Witness saw him again in April, 1926, when he suffered an attack of hemiplegia. Witness thought it was possible that the accident of November 23, 1925, might have caused deceased's death, but thought it improbable. A question was then propounded to the witness involving a suggestion that after the attack of hemiplegia it was found that deceased had a hardening of the arteries and kidney lesions. On that hypothesis the witness thought the death of deceased was likely due to endocarditis. He said, however, in answer to a further question, that the injury could have been a contributing factor of his death.

Dr. George F. Roberts, a physician who had heard the testimony of the other witnesses, was examined by the plaintiffs' attorney and asked his opinion as to what caused the death of deceased. Reviewing the history as he understood it from the witnesses, he was of opinion that there was no direct connection between the injury or the blow and the resulting death. He thought the death was due to cerebral hemorrhage or cerebral embolus. The cerebral embolus came from the heart valves (if it was an embolus), and the hem-

orrhage was due to rupture of an artery in the brain. An embolus is any foreign body which gets loose in the blood stream. Witness said he did not agree with Dr. Joseph Hughes who testified that inflammation of the spinal cord caused the embolus. If there had been a clot formed in a vessel of the spinal cord, the clot would have gone to the lung and not to the brain. Deceased would have had pulmonary embolus instead of cerebral embolus. Witness was of opinion the symptoms testified to were the result of cerebral embolus. The witness was positive in his opinion that the death of deceased was not the result of the accident and had no connection therewith.

Dr. Thomas A. Flood, a physician and surgeon, was called by the plaintiffs. His attention was called to the testimony of Dr. Joseph Hughes that there was an injury to the spinal cord of deceased which caused inflammation, and that the inflammation caused hemiplegia and an embolus from which he died. Witness thought it improbable. He said what we call "strokes" are not caused by injuries to the cord. He was then asked and answered the following questions:

"Q. What is the anatomy of the cord as it is placed in the body? A. The cord is, roughly speaking, as a tail or appendage to the brain. Roughly speaking, it is, in shape, circular with a clevity in the front part and in the back part—anterior and posterior depressions—and in these depressions there is the arachnoid membranes which carry numerous fine blood vessels. That extends down to the first lumbar vertebra, but it is not continued beyond there. This cord moves freely in this spinal canal sidewards, forwards, and backwards. You cannot say it has any strong attachments holding it in place in the spinal canal. Injuries of the spinal cord do not cause hemiplegia. Hemiplegia is a totally different thing and is due to some pressure within the brain—up in the skull rather than in the spinal canal. It is in the region of the lenticular nucleus where the fibers from the motor and sensory regions of the brain pass through before entering the cord. The cord is merely a cable and carries motor and sensory impressions, that is all.

"Q. You would expect some injury to the vertebra if there were an injury to the cord? A. There would have to be a severe crushing injury to damage the cord. It is well protected. It is practically in

the middle of the body. In the neck it is exactly in the center of the body."

The witness was of opinion that the diagnosis of Dr. Hughes was wrong; that the hemiplegia of which deceased died was not the result of inflammation of the spinal cord; and furthermore, the witness thought it improbable that the spinal cord was injured as it is protected by the bones of the vertebra, and the vertebra itself showed no signs of injury.

Dr. S. D. Colonge, a physician and surgeon, called by plaintiffs testified: According to the history of the case, as stated by Dr. Curtis, and as testified to by Dr. Flood, he would not say that the accident was the cause of, or contributed to, the death of deceased. He agreed with Dr. Flood that there is no direct blood connection from the cord to the brain. Inflammation of the spinal cord would be meningitis. The man would be prostrated most of the time, unconscious, and never able to raise on his feet. He was of opinion Dr. Hughes was mistaken in his diagnosis. "Diagnosis of embolus from inflammation of the cord being transferred to the brain is an absolute anatomical impossibility."

Dr. Foster J. Curtis, a practicing physician, testified that in his opinion from the examination he had made, deceased had an organic heart lesion, and that deaths in such cases and their history are the same as manifested in this case, without a history of any accident whatever. In view of this history he was of opinion that the accident did not contribute to the death of deceased.

It appears in the record from a written communication by Dr. Hagan in 1920 that he treated deceased for an ailment which he denominated "miocarditis." Deceased also in the same year wrote to the commission informing it that Dr. Hagan had called it "carditis." Dr. Curtis also testified to some abnormal condition of the heart in April, 1926,

when he examined deceased. All of the lay witnesses who had known deceased for many years, some of whom had worked with him in the same employment, were apparently ignorant of any affliction of his heart, but supposed he was a strong able-bodied man. His wife who lived with him continuously appears to have been ignorant of such affliction.

The foregoing statement is a condensed abridgment of the evidence. But we have stated more, perhaps, than is necessary in view of our limited jurisdiction in this class of cases. The findings of the commission as to facts are conclusive, if there is any substantial evidence to sustain them. This proposition is incontrovertible, and this court cannot disregard it without a flagrant usurpation of power. As before stated, two facts were put in issue. (1) Was there an accident and a resulting injury to deceased in the course of his employment? (2) If there was, did it result in his death or contribute thereto?

The first question must be answered in the affirmative. The exclamation of deceased, "You are knocking beets down on me," was of the res gestae, and was competent and substantial evidence that deceased had been struck by falling beets. His paralytic affliction following almost, if not immediately, thereafter, together with the fact that there was external indication of his having received an injury on the back of his neck and between the shoulders, which could have been caused by beets falling upon him, renders it practically conclusive that there was an accident, and that injury resulted therefrom.

The second question became the bone of contention among several physicians, all of whom, as far as we are advised, are of high character and eminent standing in their profession. They differed in their diagnoses and in their conclusions. It is not the province of this court to undertake to determine which of them were right and

which were wrong. Our sole province is to ascertain if there is any substantial evidence to sustain the award.

Dr. Joseph Hughes, the physician who attended deceased continually from the day of the accident to the day of his death, was positive in his opinion that the death of deceased was the result of the accident which occurred on November 23, 1925. He gave his reasons therefor. He had a theory upon which he based his ultimate conclusion. This court cannot say that either his theory or his conclusion was wrong. Nor can we say that his testimony as to the cause of death is not substantial evidence of the fact. Besides this, there is ample evidence of the fact that until the very moment of the accident deceased was a strong, able-bodied man, capable of performing hard manual labor. After the accident he was never well again and never able to work. Notwithstanding the plausible theories of the medical experts who testified on behalf of the plaintiffs, it taxes human credulity to the utmost to believe that the accident did not in some manner contribute to the death of deceased.

Dr. E. G. Hughes disagreed with Dr. Joseph Hughes upon the question of probabilities. He did not think it probable that death resulted from the accident, but thought it was possible. When asked if the accident could be a contributing factor, he said it could.

All of the other physicians sworn in the case were positive in their opinions that the accident neither caused the death of deceased nor contributed thereto. There is much in the reasoning of some of them that appeals to the mind of this court. But, as before suggested, unless we can say as matter of law that the testimony of Dr. Joseph Hughes as to the cause of death is not substantial evidence, we have no power to annul the award, even though we might be of opinion the preponderance of the evidence is the other way. We have no more power to annul the award, if there is substantial evidence to sustain it, than the commission will

have to disregard this opinion when it is handed down. Such are the limitations by which we are circumscribed.

Being of opinion that there is substantial evidence to sustain the award, the same is hereby affirmed.

CHERRY and GIDEON, JJ., and RITCHIE, District Judge, concur.

STRAUP, J. (dissenting). Were I of the opinion that on the record there was sufficient evidence, though in direct conflict, to support the finding of the commission as to the cause of death and of the award made, I should readily concur even though I were of the opinion that the finding and the award were against what appears to be the fair preponderance of the evidence.

The deceased died of a cerebral hemorrhage or cerebral embolus 8 or 9 months after the accident. True, Dr. Hughes expressed the opinion that death was due to the accident or that the accident contributed thereto on the theory that a sugar beet or beets falling 10 or 12 feet and striking the neck of the deceased or the base of the neck between his shoulders caused a concussion and inflammation of the spinal cord from which the hemorrhage or embolus resulted.

In my judgment, no substantial reasons were given to support such an opinion, or reasonably to lead to the conclusion, or to justify a finding that it was fairly probable that the accident was the cause of or contributed to the death. That the accident could have caused the death does not suffice; it fairly must be made to appear that it was the cause of death. It certainly ought to require something more than a mere expressed opinion to show how a beet or beets falling 10 or 12 feet and striking the neck of the deceased or between his shoulders at the base of the neck, causing a concussion and inflammation of the spinal cord, may and in all probability did result in a cerebral hemorrhage or cerebral embolus causing death. That, in my opinion, is not shown.